## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | :    No. |
| v. | : |
| | : |
| NATURAL ADVANTAGE LLC, | :    (electronically filed) |
| a/k/a TASTE ADVANTAGE LLC, | : |
|             Defendant | : |

## DEFERRED PROSECUTION AGREEMENT

Defendant Natural Advantage LLC and its affiliate Taste Advantage

LLC (collectively, "Natural Advantage" or the "Company"), by its

undersigned representatives, and the United States Attorney's Office for

the Middle District of Pennsylvania (the "United States"), enter this

Deferred Prosecution Agreement (the "Agreement"), the terms and

conditions of which are as follows:

## Criminal Information and Acceptance of Responsibility

1.      The Company acknowledges and agrees that the United

States will file a one-count criminal Information in the United States District

Court for the Middle District of Pennsylvania, charging the Company with

distributing and exporting List 1 chemicals without a registration issued by

the Attorney General, in violation of Title 21, United States Code, Section

843(a)(9). In so doing, the Company: (a) knowingly waives its right to

indictment on this charge, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) knowingly waives for the purposes of this Agreement and for the purposes of any charges by the United States arising out of the conduct described in the attached Statement of Facts any objection with respect to venue, and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Middle District of Pennsylvania. The United States agrees to defer prosecution of the Company pursuant to the terms and conditions described below.

2.     Natural Advantage admits, accepts, and acknowledges that it is responsible for the acts of its officers, members, managers, and employees as charged in the Information, and as set forth in the Statement of Facts attached hereto as Attachment A and incorporated by reference into this Agreement, and that the allegations described in the Information and the facts described in Attachment A are true and accurate. Should the United States pursue the prosecution that is deferred by this Agreement, the Company agrees that it will neither contest the admissibility, nor contradict the Statement of Facts in any proceeding, including any trial,

2

guilty plea, or sentencing proceeding. Neither this Agreement nor the criminal Information is a final adjudication of the matters addressed in those documents.

## Term of the Agreement

3.     This Agreement is effective for a period beginning on the date on which the Information is filed and ending three years from the later of the date on which the Information is filed or the date on which the Court approves the Agreement. However, the Company agrees that in the event that the United States determines, in its sole discretion, and subject to the notice and opportunity to respond provisions in Paragraph 18, that the Company has knowingly violated any provision of this Agreement, an extension or extensions of the term of the Agreement may be imposed by the United States, in its sole discretion, for up to a total additional time period of one year, without prejudice to the United States' right to proceed as provided in Paragraphs 17 through 21 below. Any extension of the Agreement extends all terms of this Agreement. Conversely, in the event the United States finds, in its sole discretion, that the provisions of this Agreement have been satisfied, the term of the Agreement may be terminated early. If the Court rejects the Agreement, (a) all provisions of

the Agreement, including all attachments to and representations in this Agreement, shall be deemed null and void, and the term shall be deemed to have not begun; (b) no provision of the Agreement, including any attachment to or representation in the Agreement, shall be admissible or otherwise employed in any manner in any trial, guilty plea, or sentencing proceeding; and, (c) the Company will be entitled to contradict any provision of the Agreement, including any attachment to or representation in the Agreement, in any trial, guilty plea, or sentencing proceeding.

## Relevant Considerations

4.    The United States enters this Agreement based on the individual facts and circumstances presented by this case and the Company. Among the factors considered were the following:

- a. the seriousness of the conduct described in the Statement of Facts, including misconduct that spanned multiple jurisdictions and was known to and directed by company management;
- b. the Company's willingness to acknowledge and accept responsibility for its conduct;
- c. the Company's commitment to enhance its regulatory compliance measures, including implementing annual audits by

4

an independent auditor, providing the United States with access
to and reports by that independent auditor, and certifying
compliance with regulations promulgated by the Attorney
General and the Drug Enforcement Administration ("DEA")
following each audit;

d. the Company's agreement to cooperate with law enforcement
officials in any ongoing investigation of the conduct of the
Company and its officers, members, managers, employees,
agents, consultants, affiliates, and any other party relating to
the illegal manufacturing, distribution, importation, or
exportation of List 1 chemicals;

e. the Company's willingness to disgorge the gross revenue
attributable to the Company's misconduct;

f. the potential collateral consequences to employees of the
Company who are not culpable for any misconduct;

g. the absence of any prior criminal history by the Company; and

h. the Company's willingness to settle any and all civil and
criminal claims currently held by the United States for any act
within the scope of the Statement of Facts.

## Future Cooperation and Disclosure Requirements

5.      The Company shall continue to cooperate fully with the United States in any and all matters relating to the conduct described in this Agreement and the Statement of Facts under investigation by the United States, at any time during the Term of the Agreement, subject to applicable law and regulations, until the end of the term of the Agreement. At the request of the United States, the Company shall also cooperate fully with other federal law enforcement and regulatory authorities and agencies, in any investigation of the Company or any of its present or former officers, members, managers, employees, agents, agent employees, consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and the Statement of Facts under investigation by the United States at any time during the term of the Agreement. The Company agrees that its cooperation shall include, but not be limited to, the following:

> a. The Company shall truthfully disclose all factual information relating to the conduct described in this Agreement and the Statement of Facts and other conduct under investigation by the United States at any time during the term of the Agreement that is in the possession of the Company and that is not

6

protected by a valid claim of attorney-client privilege or work product doctrine, with respect to its activities, and those of its present or former directors, members, managers, employees, agents, agent employees, and consultants, including any evidence or allegations and internal or external investigations about which the Company has any knowledge or about which the United States may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide to the United States, upon request, any document, record or other tangible evidence about which the United States may inquire of the Company, subject to applicable law and regulations;

b. Upon request of the United States, the Company shall designate knowledgeable employees, agents or attorneys to provide the United States the information and materials described in Paragraph 5(a) above on behalf of the Company. It is further understood that the Company must at all times provide complete, truthful, and accurate information;

c. The Company shall use its reasonable best efforts to make

7

available for interviews or testimony, as requested by the United States, present or former officers, members, managers, employees, agents, agent employees, and consultants of the Company, concerning the matters set forth in Paragraph 5(a). This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with federal law enforcement and regulatory authorities, concerning the matters set forth in Paragraph 5(a). Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation;

d. With respect to any information, testimony, documents, records or other tangible evidence provided to the United States pursuant to this Agreement, the Company consents to any and all disclosures, subject to applicable law and regulations, to other governmental authorities, including United States authorities and those of a foreign government, of such materials as the United States, in its sole discretion, shall deem appropriate; and

e. If the Company cannot cooperate with the obligations in
   Paragraph 5 due to applicable law, regulations, or a valid claim
   of privilege or protection, the Company will provide a log listing
   a general description of the information withheld, the applicable
   law, regulation, privilege, or protection that prevents disclosure
   of the information requested, and a detailed statement
   explaining why the applicable law, regulation, privilege, or
   protection prevents disclosure.

6.    In addition to the obligations in Paragraph 5 above, during the
term of the Agreement, should the Company learn of credible evidence or
allegations of criminal violations of United States federal law by the
Company or any of its present or former officers, members, managers,
employees, agents, agent employees, or consultants, the Company shall
promptly report such evidence or allegations to the United States.

## Forfeiture Amount

7.    As a result of Natural Advantage's conduct, including the
conduct set forth in the Statement of Facts, the parties agree that the
United States could institute a civil forfeiture action against certain funds
held by Natural Advantage and that such funds would be forfeitable

pursuant to Title 18, United States Code, Section 981 and Title 28, United States Code, Section 2461(c). Natural Advantage hereby acknowledges that $1,938,650.10 in gross revenue from the sale of List 1 chemicals are traceable to transactions in violation of Title 21, United States Code, Section 843(a)(9), as described in the Statement of Facts. Natural Advantage hereby agrees to forfeit to the United States, in a related civil forfeiture proceeding, the sum of $1,938,650.10 (the "Forfeiture Amount"), currently held by the United States Marshals Service in an Escrow Account established pursuant to an agreement entered by the United States and Natural Advantage on August 14, 2017, enclosed hereto as Attachment D. Pursuant to that civil forfeiture proceeding, Natural Advantage releases any and all claims it may have to the Forfeiture Amount. The Company agrees to sign any additional documents necessary to complete civil forfeiture of the Forfeiture Amount.

8.     The Forfeiture Amount paid is final and shall not be refunded should the United States later determine that the Company has breached this Agreement and commences a prosecution against the Company. In the event of a breach of this Agreement and subsequent prosecution, the United States is not limited to the Forfeiture Amount. The United States

10

agrees that in the event of a subsequent breach and prosecution, it will recommend to the Court that the amounts paid pursuant to this Agreement be offset against whatever forfeiture the Court shall impose as part of its judgment. The Company understands that such a recommendation will not be binding on the Court.

## **Conditional Release from Liability**

9.      Subject to Paragraphs 15 through 18 below, the United States agrees, except as provided herein, that it will not bring any criminal or civil case against the Company relating to any of the conduct described in the Statement of Facts, attached hereto as Attachment A, the criminal Information filed pursuant to this Agreement, or information that the Company disclosed to the United States prior to the date of the Agreement. The United States, however, may use any information related to the conduct described in the attached Statement of Facts against the Company in a: (a) prosecution for perjury or obstruction of justice; or (b) prosecution for making a false statement.

> a. This Agreement does not provide any protection against prosecution for any future conduct by the Company.
>
> b. In addition, this Agreement does not provide any protection

11

against prosecution of any present or former officer, member, manager, employee, shareholder, agent, agent employee, consultant, contractor, or subcontractor of the Company for any violations committed by them.

## Corporate Compliance and Audits

10.     The Company represents that it has ceased and will refrain from distributing or exporting List I chemicals unless and until it obtains a registration issued by the Attorney General, through the DEA, pursuant to Title 21 of the United States Code, and Title 21 of the Code of Federal Regulations.

11.     The Company agrees that within 90 calendar days of the filing of this Agreement and the accompanying Information, the Company will retain an independent auditor (the "Auditor") for the term of this Agreement, and at the Company's expense. The Auditor's duties and authority, and the obligations of the Company with respect to the Auditor and the United States, are set forth in Attachment C, which is incorporated by reference into this agreement. Within 60 calendar days after the execution of this Agreement, and after consultation with the United States, the Company will propose to the Department at least one candidate to serve as the Auditor.

If the United States, in its sole discretion, is not satisfied with the candidate(s) proposed, the United States reserves the right to seek additional nominations from the Company. The Auditor candidate(s) shall have, at a minimum, the following qualifications:

- a. demonstrated expertise with List 1 chemical analyses and manufacturing processes;

- b. expertise reviewing corporate production, distribution, exportation, and accounting records;

- c. the ability to access and deploy resources as necessary to discharge the Auditor's duties as described in this Agreement; and

- d. sufficient independence from the Company to ensure effective and impartial performance of the Auditor's duties as described in this Agreement.

12.    If the Auditor resigns or is otherwise unable to fulfill its obligations as set out herein and in Attachment C, the Company shall within 60 calendar days recommend at least one replacement candidate in accordance with the procedures and qualifications set forth in Paragraph 11.

13.     Within 10 days of receiving each annual audit report prepared by the Auditor, as set forth in Attachment C, the Company shall provide to the United States a copy of the Auditor's report accompanied by a certification, signed by a corporate officer, that: (a) confirms or denies any deficiencies identified by the Auditor during the audit; and either (b) confirms that the Company has not distributed or exported List 1 chemicals during the time period covered by the audit; or (c) advises that the Company has obtained all requisite registrations to distribute or export List 1 chemicals.

14.     If necessary and appropriate, the Company will adopt new or modify existing reasonably designed programs, policies, procedures, and controls in order to ensure that the Company complies with all legal duties and regulations associated with List 1 chemicals, as set forth in Title 21 of the United States Code, and Title 21 of the Code of Federal Regulations.

## Deferred Prosecution

15.     In consideration of: (a) the future cooperation of the Company described in Paragraph 5 above; (b) the Company's agreement to forfeiture of $1,938,650.10 in a civil forfeiture action; and (c) the Company's agreement to engage in compliance and audit measures as described in

14

Paragraphs 10 through 13 above and Attachment C, the United States agrees that any prosecution of the Company for the conduct set forth in the Statement of Facts be and hereby is deferred for the term of this Agreement.

16. The United States further agrees that if the Company fully complies with all of its obligations under this Agreement, the United States will not continue the criminal prosecution against the Company described in Paragraph 1 and, at the conclusion of the term of this Agreement, this Agreement shall expire. Within three months of the Agreement's expiration, the United States shall seek dismissal with prejudice of the criminal Information filed against the Company described in Paragraph 1 above, and agrees not to file charges in the future against the Company based on the conduct described in this Agreement and Attachment A or any information the Company disclosed to the United States prior to the date of this Agreement.

## **Breach of the Agreement**

17. If, during the term of the Agreement, the Company (a) commits any felony under federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information; (c)

fails to cooperate as set forth in Paragraphs 5 and 6 of this Agreement; (d)
fails to put into effect or operation, implement, and maintain the auditing
and compliance measures as set forth in Paragraphs 10 through 14 of this
Agreement and Attachment C; or (e) otherwise fails to specifically perform
or to fulfill completely each of the Company's obligations under the
Agreement, regardless of whether the United States becomes aware of
such a breach after the term of the Agreement is complete, the Company
shall thereafter be subject to prosecution for any federal criminal violation
of which the United States has knowledge, including but not limited to the
charges in the Information described in Paragraph 1 and charges that arise
from the conduct set forth in the Statement of Facts, which may be pursued
by the United States Attorney's Office in the United States District Court for
the Middle District of Pennsylvania, or any other appropriate venue.
Determination of whether the Company has breached the Agreement and
whether to pursue prosecution of the Company shall be in the United
States' sole discretion, subject to the notice and opportunity to respond
provisions in Paragraph 18. Any such prosecution may be premised on
information provided by the Company or its personnel, agents, or agent
employees. Any such prosecution relating to the conduct described in the

Statement of Facts or relating to conduct known to the United States prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the expiration of the term of the Agreement plus one year. Thus, by signing this Agreement, the Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the term of the Agreement plus one year. In addition, the Company agrees that the statute of limitations as to any violation of federal law that occurs during the term of the Agreement will be tolled from the date upon which the violation occurs for the duration of the term of the Agreement plus six months, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

18. In the event that the United States determines that the Company has breached this Agreement, the United States agrees to provide the Company with written notice of such breach prior to instituting any prosecution resulting from such breach. Within 30 days of receipt of

17

such notice, the Company shall have the opportunity to respond to the United States in writing to explain the nature and circumstances of such breach, as well as the actions the Company has taken to address and remediate the situation, which explanation the United States shall consider in determining whether to institute a prosecution.

19. In the event that the United States determines that the Company has breached this Agreement: (a) all statements made by or on behalf of the Company to the United States (except statements by counsel to the Company or counsel to any current or former officer, member, manager or employee) or to the Court, including the attached Statement of Facts, and any testimony given by the Company before a grand jury, a court, or any tribunal, or at any legislative hearing, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the United States against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or

18

subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current officer, member, manager, or employee, or any person acting on behalf of, or at the direction of, the Company will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the United States.

20. The Company acknowledges that the United States has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment. The Company further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

21. Within 30 days after the expiration of the period of deferred prosecution specified in this Agreement, the Company, by a corporate officer, and after conducting a reasonable inquiry within the Company, will certify to the United States that, in good faith reliance on information provided to the corporate officer by third parties within the Company, and

based on their best information and belief, the Company has met its disclosure obligations pursuant to Paragraph 6 of this Agreement. Such certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of Title 18, United States Code Section 1001, and will be deemed to have been made in the judicial district in which this Agreement is filed.

## Sale, Merger, or Other Change in Corporate Form of Company

22.   The Company agrees that in the event that, during the term of the Agreement, it undertakes any change in corporate form, including if it sells, merges, or transfers a substantial portion of its business operations as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The Company shall provide the United States at least 30 days' notice prior to undertaking any such sale, merger, transfer, or other change in corporate form, including dissolution, in order to afford the United States an opportunity to determine if such change in corporate form would impact

the terms or obligations of the Agreement.

## Public Statements by Company

23.     The Company expressly agrees that it shall not, through
present or future attorneys, officers, members, managers, employees,
agents or any other person authorized to speak for the Company make any
public statement, in litigation or otherwise, contradicting the acceptance of
responsibility by the Company set forth above or the facts described in the
Statement of Facts. Any such contradictory statement shall, subject to cure
rights of the Company described below, constitute a breach of this
Agreement and the Company thereafter shall be subject to prosecution as
set forth in Paragraphs 17 through 20 of this Agreement. The decision
whether any public statement by any such person contradicting a fact
contained in the Statement of Facts will be imputed to the Company for the
purpose of determining whether it has breached this Agreement shall be at
the sole discretion of the United States, subject to the notice and
opportunity to respond provisions in Paragraph 18. If the United States
determines that a public statement by any such person contradicts in whole
or in part information contained in the Statement of Facts, the United States
shall so notify the Company, and the Company may avoid a breach of this

Agreement by publicly repudiating such statement(s) within five business days after notification. The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Statement of Facts. This Paragraph does not apply to any statement made by any present or former officer, member, manager, employee, or agent of the Company in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

24.     The Company agrees that if it or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult the United States to determine: (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the United States and the Company; and (b) whether the United States has any objection to the release.

25.     The United States agrees, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and

circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and changes in compliance. By agreeing to provide this information to other authorities, the United States is not agreeing to advocate on behalf of the Company, but rather is agreeing to provide facts to be evaluated independently by such authorities.

## Limitations on Binding Effect of Agreement

26.     This Agreement is binding on the Company and the United States, but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the United States will, as described in Paragraph 25, discuss the Company's compliance and cooperation with such agencies and authorities if requested to do so by the Company.

## Notice

27.     Any notice to the United States under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to the United States Attorney, United States Attorney's Office, Middle District of Pennsylvania,

23

William J. Nealon Federal Building and Courthouse, 235 N. Washington Street, Suite 311, Scranton, Pennsylvania 18503. Any notice to the Company under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to David A. Berger, Esq., Allegaert Berger & Vogel LLP, 111 Broadway, 20th Floor, New York, New York 10006. Notice shall be effective upon actual receipt by the United States or the Company.

## Complete Agreement

28.     This Agreement, including its attachments, sets forth all the terms of the agreement between the Company and the United States. No amendments, modifications, or additions to this Agreement shall be valid unless they are in writing and signed by the United States, the attorneys for the Company, and a duly authorized representative of the Company.

**AGREED:**

**FOR NATURAL ADVANTAGE LLC, a/k/a TASTE ADVANTAGE LLC:**

Date: 5-31-20          By: _____
                             Brian Byrne
                             Chief Executive Officer
                             Natural Advantage LLC,
                             a/k/a Taste Advantage LLC

Date: 6/02/20          By: _____
                             David A. Berger, Esq.
                             Allegaert Berger & Vogel LLP
                             Counsel for Natural Advantage LLC,
                             a/k/a Taste Advantage LLC

**FOR THE UNITED STATES:**

Date: 6/10/20                DAVID J. FREED
                             United States Attorney
                             Middle District of Pennsylvania

                       By: _____
                             Phillip J. Caraballo
                             Assistant United States Attorney

25

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for Natural Advantage LLC a/k/a Taste Advantage LLC (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, and of the consequences of entering this Agreement.

I have carefully reviewed the terms of this Agreement with the members of the Company. I have advised and caused outside counsel for the Company to advise the members fully of the rights of the Company, of possible defenses, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter this Agreement. I am satisfied with outside counsel's representation in this matter. I certify that I am the Chief Executive Officer for the Company and that I have been duly authorized by

26

the Company to execute this Agreement on behalf of the Company.

Date: 5-31-20

NATURAL ADVANTAGE LLC a/k/a
TASTE ADVANTAGE LLC

By: _____

Brian Byrne
Chief Executive Officer

27

## CERTIFICATE OF COUNSEL

I am counsel for Natural Advantage LLC a/k/a Taste Advantage LLC (the "Company") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the Company's members. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company.

Further, I have carefully reviewed the terms of this Agreement with the members of the Company. I have fully advised them of the rights of the Company, of possible defenses, and of the consequences of entering this Agreement. To my knowledge, the decision of the Company to enter this Agreement, based on the authorization of its members, is an informed and voluntary one.

Date: 6/02/20          By: _____
                            David A. Berger, Esq.

28

Allegaert Berger & Vogel LLP
Counsel for Natural Advantage LLC,
a/k/a Taste Advantage LLC

## ATTACHMENT A

## **STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Attorney's Office for the Middle District of Pennsylvania, (the "United States") and Natural Advantage LLC a/k/a Taste Advantage LLC (collectively, "Natural Advantage" or the "Company"). Certain of the facts herein are based on information obtained from third parties by the United States through its investigation. Natural Advantage hereby agrees and stipulates that the allegations in the Information and the following facts are true and accurate. Natural Advantage admits, accepts, and acknowledges that it is responsible for the acts of its officers, members, and employees as set forth below. If this matter were to proceed to trial, the United States would prove beyond a reasonable doubt, by admissible evidence, the facts alleged below. The evidence would establish the following facts during the material time period:

1.  Beginning in approximately January 2011 and ending in approximately January 2017, Natural Advantage violated United States laws and regulations by manufacturing, distributing, and exporting regulated List 1 chemicals, without the requisite registration issued by the Attorney General.

2.  Natural Advantage's conduct included: (1) distributing and exporting List 1 chemicals without an appropriate registration, despite knowledge by certain of the Company's executives of that requirement; (2) misrepresenting to List 1 chemical suppliers that purchases of those chemicals were for Natural Advantage's internal manufacturing processes only, when in fact some of those List 1 chemicals were re-sold to Natural Advantage's customers; (3) omitting List 1 chemicals from publicly-available product lists; (4) distributing List 1 chemicals to a domestic customer with knowledge that the domestic customer would export the List 1 chemicals to a foreign customer, the latter of whom would not purchase directly from Natural Advantage because of its lack of requisite registration; and

(5) failing to report annually to the Attorney General information concerning List 1 chemical manufacturing.

3. This conduct occurred in various foreign and domestic jurisdictions, including the Middle District of Pennsylvania.

4. The recipients of the List 1 chemicals were determined to be companies in the fragrance and flavoring industries, with no List 1 chemicals having been diverted by Natural Advantage to narcotics manufacturers or traffickers.

## Legal Background

5. Congress enacted the Controlled Substances Act, Title 21, United States Code, Section 801 *et seq*. and its implementing regulations to regulate the manufacturing, importation, possession, use, distribution, and exportation of controlled substances and precursor chemicals, among other things.

6. Title 21, United States Code, Section 802(23) defines an "immediate precursor" as "a substance (A) which the Attorney General has found to be and by regulation designated as being the principal compound used, or produced primarily for use, in the manufacture of a controlled substance; (B) which is an immediate chemical intermediary used or likely to be used in the manufacture of such controlled substance; and (C) the control of which is necessary to prevent, curtail, or limit the manufacture of such controlled substance." Precursor chemicals include both controlled substances and List 1 chemicals.

7. Title 21, United States Code, Section 802(34) defines a List 1 chemical as "a chemical specified by regulation of the Attorney General as a chemical that is used in manufacturing a controlled substance in violation of this subchapter and is important to the manufacture of the controlled substance." Phenylacetic Acid, its esters and its salts, and Piperonal, its salts, optical isomers, or salts of an optical isomer, are both referenced as List 1 chemicals. *See* 21 U.S.C. §§ 802(34)(H), (R) and (Y). Both List 1 chemicals are potential precursors for controlled substances.

8. Phenylacetic Acid, its esters and its salts (including Phenylacetate,

Ethyl Phenylacetate, and Isoamyl Phenylacetate, and referred to collectively as "Phenylacetic Acid") is a precursor chemical used to manufacture methamphetamine, but also has legitimate purposes, including as a compound used when manufacturing fragrances. Piperonal, its esters and its salts (including Heliotropine, and referred to collectively as "Piperonal") is a precursor chemical used to manufacture MDMA (commonly referred to as ecstasy), but also has legitimate purposes, including as a compound used when manufacturing fragrances and food flavoring.

9. Title 21, United States Code, Section 802(39)(A) defines a "regulated transaction" to include the distribution or sale of "a listed chemical, or if the Attorney General establishes a threshold amount for a specific listed chemical, a threshold amount, including a cumulative threshold amount for multiple transactions." Pursuant to the Attorney General's rulemaking authority, see 21 U.S.C. § 821, one kilogram of Phenylacetic Acid and four kilograms of Piperonal are the thresholds for qualifying as a regulated transaction. See 21 C.F.R. § 1310.04(f)(1)(i). Exempted from this regulatory framework are chemical mixtures containing 40% or less of Phenylacetic Acid or 20% or less of Piperonal. 21 C.F.R. §§ 1310.12(a), (c).

10. Title 21, United States Code, Section 822(a)(1) states that "[e]very person who manufactures or distributes any controlled substance or list I chemical, or who proposes to engage in the manufacture or distribution of any controlled substance or list I chemical, shall obtain annually a registration issued by the Attorney General in accordance with the rules and regulations promulgated by him." The Attorney General has exercised this rulemaking authority to require non-exempt persons who distribute List 1 chemicals to obtain annual registrations specific to each List 1 chemical to be handled. See 21 C.F.R. § 1309.21.

11. The registration process to distribute a List I chemical, as set forth in Title 21, United States Code, Section 823(h), requires the Attorney General, through the DEA, to determine whether the registration is inconsistent with the public interest by considering:

    a.    maintenance by the applicant of effective controls against

diversion of List 1 chemicals into illegitimate channels;

b.   compliance by the applicant with laws;

c.   any prior convictions by the applicant for controlled substances or listed chemicals;

d.   the applicant's experience in manufacturing and distributing listed chemicals; and

e.   other factors relevant to public health and safety.

12.  Title 21, United States Code, Section 843(a)(9) provides that it is "unlawful for any person knowingly and intentionally . . . to distribute, import, or export a list I chemical without the registration required." Registration requirements are "waived for any manufacturer of a List I chemical, if that chemical is produced solely for internal consumption by the manufacturer and there is no subsequent distribution or exportation of the List I chemical," although exempt parties still must comply with security, recordkeeping, and reporting requirements. 21 C.F.R. §§ 1309.24(h), (k).

13.  Any "regulated person," *i.e.*, "a person who manufactures, distributes, imports, or exports a listed chemical," *see* 21 U.S.C. § 802(38), who manufactures a listed chemical must report annually to the Attorney General "information concerning listed chemicals manufactured by the person." 21 U.S.C. § 830(b)(2).

## Natural Advantage Background

14.  Natural Advantage LLC is a chemical manufacturer headquartered in Oakdale, Louisiana. The Company also maintains domestic facilities in Lakeland, Florida, operating under Taste Advantage LLC. From 2011 to 2017, the Company accrued gross average revenues of between approximately $20,000,000 and $30,000,000.

15.  The Company's primary business involved the manufacturing and distribution of chemicals used in the flavor and fragrance industries, to customers located both domestically and internationally. In the course of its business operations, the Company also purchased

33

chemicals from other chemical manufacturers. Among the chemicals manufactured and purchased by the Company were List 1 chemicals Phenylacetic Acid and Piperonal.

## Natural Advantage Distributed and Exported List 1 Chemicals Without Obtaining Annual Registration from the Attorney General

16. Beginning in at least January 2011, Natural Advantage distributed and exported Phenylacetic Acid and Piperonal. In or about February 2011, Natural Advantage filed three applications for DEA registration as a Chemical Importer for Benzaldehyde, Phenylacetic Acid and Piperonal, as a Chemical Exporter for Benzaldehyde, Methylamine, Phenylacetic Acid and Piperonal, and as a Chemical Manufacturer for Benzaldehyde and Phenylacetic Acid. All of the operative chemicals were List 1 chemicals. All three DEA applications were subsequently denied and withdrawn by DEA, because Natural Advantage did not provide requested information during the DEA's pre-registration due diligence process.

17. By letter dated July 20, 2011, the DEA advised Natural Advantage of its failure to complete the licensure process. In doing so, the DEA specifically advised that any List 1 chemicals manufactured or purchased by Natural Advantage were limited to internal consumption, and could not be distributed. The DEA offered Natural Advantage 15 days to cure its defunct registration applications, but the Company did not avail itself of that opportunity.

18. Despite its lack of appropriate DEA registrations, and knowledge of its limitations on distributing List 1 chemicals, Natural Advantage nonetheless continued to distribute and export Phenylacetic Acid and Piperonal. Between approximately January 2011 and January 2017, Natural Advantage distributed and exported in excess of 1,550 kilograms of Phenylacetic Acid and Piperonal combined, bearing purity levels of between approximately 98% and 100%. In exchange for those sales, Natural Advantage received approximately $1,938,650.10 in gross revenue.

19. The List 1 chemicals referenced above were distributed domestically, including to the Middle District of Pennsylvania and to other districts

located in New York, California, New Jersey, Kentucky, Illinois, Minnesota, and Missouri. The List 1 chemicals also were exported internationally, including to Belgium, Switzerland, the United Kingdom, and Singapore. The recipients of the List 1 chemicals were determined to be companies in the fragrance and flavoring industries, with no List 1 chemicals having been diverted by Natural Advantage to narcotics manufacturers or traffickers.

20. From 2011 through 2017, Natural Advantage did not file annual reports on its manufactured List 1 chemicals with the Attorney General, as required by law.

21. From 2011 through 2017, senior executives at Natural Advantage were aware of the registration requirements to manufacture, distribute, and export List 1 chemicals. Senior executives at Natural Advantage knew of, endorsed, and directed the manufacture, distribution, and exportation of List 1 chemicals, despite the Company's lack of the required registration.

22. From 2011 through 2017, senior executives at Natural Advantage were aware that certain customers refused to purchase List 1 chemicals from Natural Advantage, when those customers determined that Natural Advantage lacked the requisite registration. In some instances, senior executives at Natural Advantage were aware that certain foreign customers who refused to purchase List 1 chemicals directly from Natural Advantage, had arranged to instead purchase those List 1 chemicals through a third party intermediary. Senior executives at Natural Advantage knew of, endorsed, and directed the distribution of List 1 chemicals to the third party intermediary, despite knowing that the third party intermediary would re-distribute and export the List 1 chemicals to the foreign customers.

23. From 2011 through 2017, senior executives at Natural Advantage concealed its manufacture, distribution, and exportation of List 1 chemicals, including by: (1) failing to file annual reports with the Attorney General about the Company's List 1 chemical manufacturing activities; (2) removing references to List 1 chemicals in the Company's product lists and advertisements; and (3) misrepresenting to suppliers that purchased List 1 chemicals were for internal

consumption, when in fact Natural Advantage re-sold some of those List 1 chemicals.

24.   In or about January 2017, Natural Advantage ceased distributing and exporting List 1 chemicals. On or about February 22, 2017, the DEA executed search warrants at the Natural Advantage facilities in Oakdale, Louisiana and Lakeland, Florida. During the execution of those warrants, the DEA seized approximately 5 kilograms of Phenylacetic Acid from the Lakeland, Florida facility, and approximately 114 kilograms of Benzaldehyde, 9 kilograms of Piperanol, 4 kilograms of Piperidine, and 2 kilograms of Phenylacetic Acid from the Oakdale, Louisiana facility. All of the substances were List 1 chemicals.

## ATTACHMENT B

## **CERTIFICATE OF CORPORATE RESOLUTIONS**

WHEREAS, NATURAL ADVANTAGE LLC, a/k/a TASTE ADVANTAGE LLC (collectively, "Natural Advantage" or the "Company"), has been engaged in discussions with the United States Attorney's Office for the Middle District of Pennsylvania, (the "United States") regarding the distribution and exportation of List 1 chemicals without a registration issued by the Attorney General; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter a deferred prosecution agreement with the United States (the "Deferred Prosecution Agreement"); and

WHEREAS, the Company's Chief Executive Officer, Brian Byrne, together with outside counsel for the Company, have advised the members of the Company of the Company's rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the United States;

Therefore, the members of the Company have RESOLVED that:

1.    The Company: (a) acknowledges the filing of the Information charging the Company with distributing and exporting List 1 chemicals

without a registration issued by the Attorney General, in violation of Title 21, United States Code, Section 843(a)(9); (b) waives indictment on such charge and enters into the Deferred Prosecution Agreement with the United States; and (c) agrees to forfeit $1,938,650.10 to the United States, in a civil forfeiture action;

2.    The Company's Chief Executive Officer, Brian Byrne, is hereby authorized, empowered and directed, on behalf of the Company, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by the members of the Company with such changes as the Company's Chief Executive Officer, Brian Byrne, may approve;

3.    The Company's Chief Executive Officer, Brian Byrne, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

4.    All of the actions of the Company's Chief Executive Officer, Brian Byrne, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of

38

such resolutions, are hereby severally ratified, confirmed, approved, and

adopted as actions on behalf of the Company.

Date: 5 -31 -20        By: _____

Brian Byrne
Chief Executive Officer
Natural Advantage LLC,
a/k/a Taste Advantage LLC

39

## ATTACHMENT C

## **AUDITOR'S DUTIES AND AUTHORITY**

The duties and authority of the Auditor, and the obligations of Natural Advantage LLC a/k/a Taste Advantage LLC (collectively, the "Company"), with respect to the Auditor and the United States, are as described below:

A. The Auditor will, during the three-year term of this Agreement and any extension thereof, evaluate and audit, in the manner set forth below, the effectiveness of the Company's compliance with all applicable legal and regulatory duties associated with List 1 chemicals (the "Mandate").

B. The Company shall cooperate fully with the Auditor and the Auditor shall have the authority to take such reasonable steps as, in the Auditor's view, may be necessary to be fully informed about the Company's compliance efforts within the scope of the Mandate in accordance with the principles set forth herein and applicable law, including applicable data protection and labor laws and regulations. To that end, the Company shall: (a) facilitate the Auditor's access to the Company's personnel, facilities, documents, and records; (b) not limit such access, except as provided in this paragraph; and (c) provide guidance on applicable local law (such as

40

relevant data protection and labor law). The Company shall provide the Auditor with access to all information, personnel, facilities, documents, and records of the Company, as reasonably requested by the Auditor, that fall within the scope of the Mandate of the Auditor under this Agreement. Any disclosure by the Company to the Auditor concerning the distribution or exportation of List 1 chemicals shall not relieve the Company of any otherwise applicable obligation to truthfully disclose such matters to the United States .

C.    The parties agree that no attorney-client or other privileged relationship shall be formed between the Company and the Auditor.

D.    In the event the Company seeks to withhold from the Auditor access to information, personnel, facilities, documents, or records of the Company which may be subject to a claim of attorney-client privilege or to the attorney work-product doctrine, or where the Company reasonably believes production would otherwise be inconsistent with applicable law, the Company shall work cooperatively with the Auditor to resolve the matter to the satisfaction of the Auditor. If the matter cannot be resolved, at the request of the Auditor, the Company shall promptly provide written notice to the Auditor and the United States. Such notice shall include a general

41

description of the nature of the information, personnel, facilities, documents, or records that are being withheld, and a basis for the claim. The United States may then consider whether to make a further request for access to such information, personnel, facilities, documents, or records.

      E.     To carry out the Mandate, during the term of this Agreement, the Auditor shall conduct an initial audit and prepare an initial report, followed by two follow-up audits and reports as described below. The initial audit shall occur within 60 days of the engagement of the Auditor, as provided in Paragraphs 11 through 13 of this Agreement. The second audit shall occur approximately one year after the initial audit. The final audit shall occur approximately 90 days prior to the conclusion of the term of this Agreement. With respect to each audit, after meeting and consultation with the Company and the United States, the Auditor shall prepare a written work plan, which shall be submitted no fewer than 30 calendar days prior to commencing each audit to the Company and the United States for comment, which comment shall be provided within 14 calendar days after receipt of the written work plan. The Auditor's work plan for the initial audit shall include such steps as are reasonably necessary to conduct an effective initial audit in accordance with the Mandate, including by

42

developing an understanding, to the extent the Auditor deems appropriate, of the facts and circumstances surrounding any violations of List 1 chemical law and regulations that occurred before the date of acceptance of this Agreement by the Court, but in developing such understanding the Auditor is to rely to the greatest extent possible on available information and documents provided by the Company and by the United States, and it is not intended that the Auditor will conduct its own inquiry into those historical events. In developing each work plan and in carrying out the audits pursuant to such plans, the Auditor is encouraged to coordinate with Company personnel including compliance and accounting personnel and, to the extent the Auditor deems appropriate, the Auditor may rely on the Company processes, on the results of studies, review, audits, and scientific analyses conducted by or on behalf of the Company and on sampling and testing methodologies. The Auditor is not expected to conduct a comprehensive review of all business lines, all business activities, or all markets. Any dispute between the Company and the Auditor with respect to the work plan shall be decided by the United States in its sole discretion.

F.     Following each audit, the Auditor shall issue a written report within 60 calendar days of initiating each audit, setting forth the Auditor's

findings and assessment of the Company's compliance with List 1 chemical laws and regulations. The Auditor is encouraged to consult with the Company concerning the Auditor's findings on an ongoing basis, and to consider and reflect the Company's comments and input to the extent the Auditor deems appropriate. The Auditor need not in its audit reports recite or describe comprehensively the Company's history or compliance policies, procedures, and practices, but rather may focus on those areas which the Auditor concludes merit particular attention. The Auditor shall provide the reports to the Company and contemporaneously transmit copies to the United States. After consultation with the Company, the Auditor may extend the time period for issuance of a report for up to 15 calendar days, with prior approval of the United States.

G. In undertaking its findings and assessments, the Auditor shall formulate conclusions based on, among other things: (a) an inspection of relevant documents and records of the Company; (b) on-site observation of the Company's facilities; (c) meeting with, and interview of, relevant Company employees, members, managers, and agents at mutually convenient times and places; and (d) analyses, studies and testing of the Company's manufacturing and sales processes and records with respect to

List 1 chemicals.

H.    Should the Auditor, during the course of its engagement, discover actual or potential violations of applicable List 1 chemical laws and regulations, the Auditor shall promptly report such findings to the Company and to the United States. The Auditor may disclose such actual or potential violations in its discretion to the United States, and not to the Company, only if the Auditor believes that disclosure to the Company would be inappropriate under the circumstances, and in such an event should disclose the actual or potential violations to the Company as promptly and completely as the Auditor deems appropriate under the circumstances. Further, in the event that the Company, or any entity or person working directly or indirectly within the Company, refuses to provide information necessary for the performance of the Auditor's responsibilities, if the Auditor believes that such refusal is without just cause, the Auditor shall disclose that fact to the United States and the Company. The Company shall not take any action to retaliate against the Auditor for any such disclosure or for any other reason. The Auditor may report any actual or potential criminal or regulatory violations by the Company or any other entity discovered during the course of performing the Auditor's duties, in

the same manner as described above.

I.       The Auditor's reports may include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the reports could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the Auditor's Mandate.  For those reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the United States determines in its sole discretion that disclosure would be in furtherance of the United States' discharge of its duties and responsibilities or is otherwise required by law.  Moreover, the Auditor is prohibited from using any information obtained in connection its retention by the Company for any purpose other than the performance of its duties as set forth in this Agreement.

J.       The Company and the United States may meet and confer together, as is appropriate, to discuss the Auditor and any suggestions, comments, or improvement the Company may wish to discuss with or propose to the United States.

# ATTACHMENT D

## **AGREEMENT OF AUGUST 14, 2017**

## AGREEMENT

This Agreement (this "Agreement") is made and entered into as of ~~July~~ *August* **14**, 2017, by and among The United States of America, Natural Advantage LLC, a Louisiana limited liability company also operating under the name Taste Advantage LLC (collectively, "Natural Advantage"), and Brian and Carol Byrne (the "Byrnes").

## RECITALS

WHEREAS, on or about February 23, 2017, the Drug Enforcement Administration of the U.S. Department of Justice (the "DEA") served a seizure warrant on Bank of America that seized funds totaling $415,764.00 from account number 000907706878 in the name of Carol Byrne Sole Prop DBA Natural Advantage (the "BofA account");

WHEREAS, on or about February 23, 2017, the DEA served a seizure warrant on Capital One (together with the BofA seizure warrant, the "Seizure Warrants") that seized funds totaling $42,261.15 from account number 00006020037367 in the name of Natural Advantage (the "Capital One account");

WHEREAS, on or about April 3, 2017, the DEA served Notices of Seizure of Property and Initiation of Administrative Forfeiture Proceedings on Natural Advantage regarding the seized funds from the BofA account and the Capital One account (the "Seized Funds");

WHEREAS, on or about May 4, 2017, Natural Advantage and the Byrnes served Seized Asset Claim Forms on the DEA to contest forfeiture of the funds from the BofA account and the Capital One account, thereby timely stopping the administrative forfeiture proceedings; and

WHEREAS, to avoid the potential service of additional seizure warrants and the cost, uncertainty and expense of additional litigation over the restraint, seizure and forfeiture of property, the parties hereto agree as follows:

## THE ESCROW ACCOUNT

1. Within 10 days of executing this Agreement, Natural Advantage shall forward a cashier's check in the amount of $300,000.00 made payable to the United States Marshals Service, via overnight carrier addressed to c/o United States Attorney's Office, Asset Forfeiture Unit, 235 North Washington Avenue, Suite 311, Scranton, Pennsylvania 18501.
2. Upon receiving the cashier's check referenced in paragraph 1 of this Agreement, the United States will deposit it into an escrow account designated by the United States (the "Escrow Account"). The United States will also credit the Seized Funds ($458,025.15) to the Escrow Account.

1

3. Within 10 days of executing this Agreement, the United States will notify Bank of America and Capital One that the BofA account and the Capital One account no longer need to be restrained.

4. On the first business day (a day other than Saturday, Sunday or any other day on which commercial banks in The City of New York are authorized or required by law to remain closed) of each month commencing in August 2017, Natural Advantage will forward a cashier's check in the amount of $150,000.00 made payable to the United States Marshals Service, via overnight carrier addressed to c/o United States Attorney's Office, Asset Forfeiture Unit, 235 North Washington Avenue, Suite 311, Scranton, Pennsylvania 18501, that will be credited toward the Escrow Account; *provided, however*, that Natural Advantage is not obligated to make any deposits into the Escrow Account on or after the date paragraph 5 of this Agreement is terminated; and, *provided further*, Natural Advantage is not obligated to deposit a total amount greater than $1,938,650.10 into the Escrow Account (minus any reduction in this amount as determined pursuant to paragraph 11 of this Agreement).

## THE STANDSTILL AGREEMENT

5. The parties hereto agree they will not assert any motions, claims, actions, causes of action, defenses, appeals, or suits whatsoever regarding the Seized Funds or funds in the Escrow Account, and the United States agrees that it will not seize, restrain or forfeit property of any type belonging to Natural Advantage (including but not limited to bank accounts in the name of Carol Byrne sole proprietor, or Taste Advantage); *provided, however*, that any party hereto may terminate this paragraph 5 upon 30 days written notice to the other parties to this Agreement.

6. The remaining paragraphs of this Agreement survive any termination of the standstill agreement set forth in paragraph 5 of this Agreement. In the event paragraph 5 is terminated, the United States will continue to maintain the Escrow Account until right, title and interest in the funds in the Escrow Account are determined by agreement of the parties hereto or by administrative or judicial forfeiture, which will be determined by a court of competent jurisdiction in accordance with applicable law, including but not limited to the time limits set forth in Section 983(a)(3) of Title 18 of the United States Code; *provided, however*, that when determining whether any motions, claims, actions, causes of action, defenses, appeals, or suits whatsoever regarding the funds in the Escrow Account are time-barred by statute of limitations, laches, or any other time-related defense, all time commencing on and including the date of this Agreement until and including the date of any termination of paragraph 5 of this Agreement shall be excluded.

7. When determining whether any motions, claims, actions, causes of action, defenses, appeals, or suits whatsoever regarding the funds in the Escrow Account or the Seized Funds are time-barred by statute of limitations, laches, or any other time-related

defense, all time commencing on and including the date of this Agreement until and including the date of termination of paragraph 5 of this Agreement shall be excluded.

8. Natural Advantage agrees that it will not distribute, import, export or manufacture any chemical designated by the DEA as a List I chemical and as set forth in Title 21, Code of Federal Regulations, Section 1310.02, unless or until it obtains all appropriate licenses and registrations from the Attorney General, as set forth in Title 21, United States Code, Section 822 and associated regulations.

## WAIVER; ADMISSIBILITY; DEFENSE COSTS

9. Except as expressly provided otherwise in this Agreement, each party hereto, by entering into this Agreement and exercising any right or performing any obligation hereunder: (x) does not give up any right, title or interest in the funds in the Escrow Account or the Seized Funds; and (y) does not waive any rights, claims, actions, or defenses, whether constitutional, statutory or otherwise (including but not limited to any such rights, claims, actions, or defenses, including jurisdiction and venue, concerning the funds in the Escrow Account or the Seized Funds).

10. This Agreement, and conduct and statements made during its negotiation, are not admissible against any party to the Agreement, except for purposes of enforcement of the Agreement's terms.

11. Natural Advantage may request, upon a good faith showing of financial hardship and based on legal authorities governing seized or forfeited property, that the United States reduce the total dollar amount required to be deposited into the Escrow Account hereunder, and/or release some or all of the funds in the Escrow Account, in order for Natural Advantage to pay attorney's fees and defense costs. In the event the United States denies Natural Advantage's request in whole or in part, Natural Advantage is entitled to petition a court of competent jurisdiction for such relief based on the authorities referenced above.

12. The representatives of Natural Advantage and the United States signing below hereby certify, represent and warrant that he or she is a duly authorized representative of the party so represented, and that the execution and performance of this Agreement is enforceable against the party so represented in accordance with the terms and conditions hereof. With regard to the United States, the representation includes the agencies involved in the investigation of any activity by Natural Advantage, the Byrnes, or their respective employees and officers.

13. This Agreement cannot be modified other than in writing that is signed by all parties.

3

Date: 7/26/17                     NATURAL ADVANTAGE LLC

By: _____

            Name: Robert Kleinhenz
            Title:   President

Date: 7/26/17                     BRIAN BYRNE

Date: 7/26/17                     CAROL BYRNE

                            BRUCE D. BRANDLER
                            United States Attorney
                            Middle District of Pennsylvania

Date: 8/14/17             By:

                            PHILLIP J. CARABALLO
                            Assistant United States Attorney

4